ROBERT DENNERY, BY JOHN DENNERY, HIS NEXT FRIEND, DEFENDANT IN ERROR, v. THE GREAT ATLANTIC AND PACIFIC TEA COMPANY, PLAINTIFF IN ERROR.

Submitted July 10, 1911—Decided November 20, 1911.

1. The unexplained presence upon a public highway of a runaway horse harnessed to a wagon, unattended by the owner or other person, raises a *prima facie* presumption of negligence on the part of the owner.
2. Evidence that the wagon which ran over the plaintiff was conspicuously marked with defendant's name was sufficient to justify the inference that defendant was the owner.
3. The refusal of a nonsuit for failure of proofs is not ground for reversal if said proofs were afterwards supplied by either party in the progress of the trial.
4. Where there was proof that the driver of a young horse, which he was driving that day for the first time, drove it up to a railroad crossing where the gates were down and upon which a freight train was drilling at the time, and left it a little while with its head toward the gates and with the hitching-weight attached, and then returned and took the hitching-weight off, put it in the wagon, and in order to see that all was right with the goods therein, went behind the rear end of the wagon, so that he may have been in such a position that he could not reach the reins in time to control the horse should it take fright at the sounds which might be expected to occur from the drilling train and which in fact did occur causing the horse to run away, it was a question for the jury whether or not the driver was guilty of negligence.

On error to the Hudson Circuit Court.

The writ reviews a judgment, on verdict, in favor of the plaintiff, who was three years and two months old, for personal injuries received by him from being run over on the public highway or street in Jersey City by defendant's runaway horse attached to its delivery wagon.

The errors assigned are to a refusal to nonsuit and to a refusal of a motion for the direction of a verdict in favor of the defendant.

The plaintiff's case showed a driverless horse running away harnessed to a delivery wagon upon which defendant's name appeared, and coming around a corner (into the street where it ran over plaintiff) from the direction of a railroad crossing, a short distance away, where trains were frequently drilling.

Upon this evidence the court refused a motion for nonsuit.

Defendant then called the driver (Wood), who testified that the team belonged to defendants, and that he, as their employe, was making deliveries for them with it when the accident happened; that this was the first day he had ever driven the horse in question (which was five years old) ; that he drove up to the railroad crossing where the gates were down and a freight train consisting of small dirt cars on springs was drilling at the time, and, attaching the hitching-weight to the horse's head, left it with its head toward the gates while he made a delivery; that he then returned, removed the hitching-weight, put it in the wagon and went around back of the wagon to see that all was right, and had come up on the side next to where the reins were when the horse became frightened at the starting of the freight cars, or the puffing of the engine, both of which the driver heard start up at that moment, and swerving sharply around started to run; that the driver grabbed at the reins, but missed them and fell down, and the horse ran around the corner and up the street where the plaintiff was injured.

For the plaintiff in error, *Griggs & Harding*.

For the defendant in error, *Tumulty & Cutley*.

The opinion of the court was delivered by

WHITE, J. By reason of their nature and training horses can be safely utilized to draw vehicles upon public streets only when controlled by reasonably competent drivers. This fact is in such complete accord with universal experience that the legal duty to supply such a driver exists, and, consequently, it is *prima facie* evidence of negligence for a person to permit his horse attached to a wagon to go out upon a public street without any driver or other person in charge. If, therefore, a horse

and wagon are found passing along a street with no one in charge, the absence of the driver gives rise to a *prima facie* presumption of negligence on the part of the owner. The fact that the horse is running does not negative this presumption. That a horse, under such circumstances, finding itself without anyone's guidance or control, should soon commence running, is the result both of its nature and of its training. Its nature is to frighten at unusual sights and sounds and to run away from them. It has been trained, however, to confide in and rely upon its driver's guidance and protection instead of resorting to its natural instincts. When, therefore, it realizes the unaccustomed absence of this guidance and sense of protection, it becomes doubly confused and timid, and sights and sounds which seemed to it harmless in the presence of its driver now seem strange and terrifying and to be avoided only by flight.

We think, therefore, that, as stated by the Supreme Court in *Kokoll* v. *Brohm & Buhl Lumber Co.*, 48 *Vroom* 169, and in *Francois* v. *Hanff, Id.* 364, the unexplained presence upon a public highway of a team of runaway horses harnessed to a wagon, unattended by the owner or other person, raises a *prima facie* presumption of negligence on the part of the owner.

The other point raised by the refusal of nonsuit assignment of error, viz., that ownership in the defendant was not proved in the plaintiff's case is without merit for two reasons:

*First.* It was proved that the defendant's name appeared conspicuously on the wagon, and we approve the doctrine as laid down by the Supreme Court in *Edgeworth* v. *Wood*, 29 *Vroom* 463, following Lord Denman's ruling in *Joyce* v. *Capel*, 8 *Car. & P.* 370, that "evidence that the wagon which ran over plaintiff was marked with defendant's name was sufficient to justify the inference that defendant was its owner, and that such inference established *prima facie* that defendant was in possession and control of the wagon by the driver, its servant," and *second,* the proof of defendant's ownership was clearly established in defendant's own case. This court has held that the refusal of a nonsuit for failure of proofs is not ground for reversal if the defect was afterward supplied by evidence taken in the progress of the trial. *Dela-*

*ware, Lackawanna and Western Railroad Co.* v. *Dailey*, 8 *Vroom* 526; *Hibernia Mutual Fire Insurance Co.* v. *Meyer*, 10 *Id.* 482. The history of this practice is fully stated in the opinion of the Supreme Court in *Bostwick* v. *Willett*, 43 *Id.* 21.

Coming now to the explanation, as offered by defendant's driver and its other witnesses, of how the runaway occurred, we do not think it presented such a clear negation of negligence on the part of the driver as to justify the court in directing a verdict for the defendant. The horse was young and this driver was driving it that day for the first time. He drove it up to the gates at the railroad crossing where a dirt car freight train was drilling at the time immediately in front of the horse. When such a train started or stopped in the process of drilling, the attendant noises from the jerking link couplings and clashing bumpers are well calculated to frighten any ordinary horse standing with its head in close proximity to the track. The shifting or other engine itself with its puffing and escaping steam, running first one way and then the other in drilling the cars upon the different switches and sidings, may be even more startling than a locomotive pulling an ordinary train. When, then, with all these circumstances before him, the driver removed the hitching-weight from this strange, young horse's head *before* going back to the rear end of the wagon to see if everything was all right instead of *afterward,* it was clearly a question for a jury to decide whether he was or was not negligent in taking a chance of the horse becoming frightened (as it did) by a sudden starting of the freight train or of its shifting engine, or both, with their naturally attendant noises, at a time when he (the driver) neither had hold of the reins nor was in a position to catch them up in time to control the horse and prevent an accident. It is true the driver said he was at the side of the wagon just ready to get in and with the reins within reach when the horse started. But the facts are that the horse took fright at the starting of the train or the puffing of the engine, that it turned and ran away, and that the driver did not get his hands upon the reins, although

he tried to do so. The jury might well have concluded from these circumstances that the driver was not as near the reins when the horse started as he thought he was, and that the accident in reality happened by reason of his unhitching the horse and then going so far away from it that it was beyond his power of control in case it became frightened, as it did, at the noises which the driver had every reason to expect would occur, and also good reason to expect might scare the horse which he had thus placed in a position of such close proximity to the alarming sounds. Under all the circumstances, we think there was no error in the refusal to direct a verdict.

The judgment of the Hudson Circuit is affirmed.

*For affirmance*—THE CHANCELLOR, CHIEF JUSTICE, GARRISON, SWAYZE, TRENCHARD, PARKER, BERGEN, VOORHEES, KALISCH, BOGERT, VREDENBURGH, CONGDON, WHITE, JJ. 13.

*For reversal*—None.